**EXHIBIT 1**

**GAREEB | PHAM,LLP**
ALEXANDER S. GAREEB, BAR NO. 207473
CHRISTOPHER Q. PHAM, Bar No. 206697
707 Wilshire Boulevard. Suite 5300
Telephone: (213) 455-2930
Facsimile: (213) 455-2940
Email: cpham@gareebpham.com

Attorneys for Defendant
KANYA TENNYSHA COLEMAN

**MEHLMAN & TERBEEK, LLP**
MARC TERBEEK, Bar No. 166098
2125 Oak Grove Road, Suite 125
Walnut Creek, California 94598
Telephone: (925) 935-3575
Facsimile: (925) 935-1798
Email: marc@mehlman-terbeek.com

Attorneys for Defendants
K PLATINUM GROUP, INC.; K PLATINUM INTERNATIONAL GROUP, INC.; K PLATINUM ASSOCIATES, INC.; K PLATINUM INTERNATIONAL ASSOCIATES, INC.; K PLATINUM FINANCIAL, INC.; K PLATINUM INTERNATIONAL FINANCIAL, INC.; K PLATINUM REALTY, INC.; K PLATINUM INTERNATIONAL REALTY, INC.;

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF CONTRA COSTA

BRUCE SARUBIN, an individual,

Plaintiff,

vs.

K PLATINUM GROUP, INC. a California Corporation; et al.

Defendants

Case No: MSC07-00049

(Consolidated with Case Nos. MSC07-00080, MSC07-00106, MSC07-00454, MSC07-00483, MSC07-00484, MSC07-00485, MSC07-00486)

**DEFENDANTS' REPORT RE REORGANIZATION OF K PLATINUM GROUP, INC.**

**Further CMC Date:** **May 24, 2007**
**Time:** **9:00 A.M.**
**Dept:**

**TO THE COURT AND ATTORNEYS OF RECORD FOR ALL PARTIES:**

In compliance with the Court's Order at the Case Management Conference of April 25, 2007, Defendants K PLATINUM GROUP, INC.; K PLATINUM INTERNATIONAL GROUP, INC.; K PLATINUM ASSOCIATES, INC.; K PLATINUM INTERNATIONAL ASSOCIATES, INC.; K PLATINUM FINANCIAL, INC.; K PLATINUM INTERNATIONAL FINANCIAL, INC.; K PLATINUM REALTY, INC.; K PLATINUM INTERNATIONAL REALTY, INC.; and KANYA TENNYSHA COLEMAN respectfully submit to the Court the following attached report and exhibits regarding the reorganization plan for K Platinum Group. Inc.

DATED: May 17, 2007

GAREEB | PHAM, LLP

By: ______________________
Christopher Q. Pham
Attorney for Defendant,
KANYA TENNYSHA COLEMAN

DATED: May 17, 2007

MEHLMAN & TERBEEK, LLP

By: ______________________
Marc TerBeek
Attorneys for Defendants,
K PLATINUM GROUP, INC.; K PLATINUM INTERNATIONAL GROUP, INC.; K PLATINUM ASSOCIATES, INC.; K PLATINUM INTERNATIONAL ASSOCIATES, INC.; K PLATINUM FINANCIAL, INC.; K PLATINUM INTERNATIONAL FINANCIAL, INC.; K PLATINUM REALTY, INC.; and K PLATINUM INTERNATIONAL REALTY, INC.

## I. INTRODUCTION

The instant matter involves eight consolidated cases (one of which has been settled) arising from the issuance of a series of Promissory Notes by K Platinum Group, Inc. At the prior Case Management Conference of April 25, 2007, the Court inquired as to the potential for insolvency of K Platinum Group, Inc. and the status of an attempted corporate reorganization to avert insolvency.

Pursuant to the Court's request, counsel for K Platinum Group, Inc. respectfully submits this report for litigation purpose on the reorganization of K Platinum Group, Inc., including the submission of balance sheets showing corporate assets and liabilities of K Platinum Group, Inc. and the key participant in the corporate reorganization, The Milhaven Group. As counsel for KPG represented to the Court at the Conference of April 25, KPG is presently conducting an internally audit and investigate and undergoing a corporate reorganization, instead of requesting the protection of the United States Bankruptcy Court.

Nothing in this report is to be construed or taken as an admission of liability by Kanya Coleman, K Platinum Group, Inc., K Platinum Realty, Inc. K Platinum Financial, Inc., and K Platinum Associates, Inc., K Platinum International Realty, Inc., K Platinum International Financial, Inc., and K Platinum International Associates, Inc., or any of their affiliated entities. Defendants reserve the right to supplement and amend this report and the attached exhibits as their investigation and reorganization efforts continue. In this regard, this report should not be construed as a response to discovery or investigation by Plaintiffs in this consolidated civil action or any Federal and/or state criminal and regulatory investigations and inquiries.

## II. FACTUAL BACKGROUND

Ms. Coleman became a licensed Real Estate Agent in June, 2000, initially transacting real estate for Prudential through the end of that year. Thereafter, she briefly transacted real estate for Ryness Realtors and then, from June, 2001 until April, 2003, for Buyers Brokers Realty. Ms. Coleman's real estate transactions with these entities followed the evolving industry standards.

In April, 2003, Ms. Coleman obtained her Real Estate Broker's license, and shortly thereafter formed K Platinum Group, Inc., K Platinum Realty, Inc. K Platinum Financial, Inc., and K Platinum Associates, Inc. (aka REPS). K Platinum Realty, Inc. was formed to conduct real estate transactions; K Platinum Financial, Inc. was formed to broker real estate mortgages; K Platinum Group, Inc. was formed as a holding company for the other K Platinum entities, and K Platinum Associates, Inc. was formed as a staffing firm for the other K Platinum entities.

K Platinum Group, Inc. and its affiliated entities operate primarily in the Bay Area market, with a focus on existing homeowners seeking to refinance current debt load and consumers seeking to acquire their first home. A pipeline of referrals resulted in real

estate transactions located in Antioch, Castro Valley, Murrieta, Oakley, Brentwood, Hercules, Discovery Bay, Chula Vista, Stockton, Richmond, and Concord.

In or about January, 2006, Ms. Coleman formed K Platinum International Group, Inc., K Platinum International Realty, Inc. K Platinum International Financial, Inc., and K Platinum International Associates, Inc., all in order to advance her business plan of becoming a Mortgage Banker with the capacity of being a Warehouse Lender.

In April, 2006, K Platinum Group, Inc. (hereafter KPG) began to issue short-term promissory notes ("Notes") in which KPG would receive a lump sum payment in exchange for its promise to repay that sum, plus a rate of interest on that sum of 25% per month for the term of the Note, payable on a month by month basis. This became known as the "Cash-on-Cash Program." Under that program, KPG was entitled to modify the terms of repayment on the note, including extension of the time for repaying the note. The participants in the Cash-on-Cash Program were thereafter permitted to re-apply the unpaid principal due and owing on the note into another program which paid approximately 10% per month, for a term of seven months.

In June, 2006, Ms. Coleman separated from her husband, and shortly thereafter, began dating Zachary Robinson. Ms. Coleman soon became pregnant with Mr. Robinson's child. However, complications from Ms. Coleman's pregnancy, coupled with her heavily litigated divorce matter, forced Ms. Coleman to limit her day-to-day involvement over the operational aspects of KPG and its affiliated entities.

Filling the vacuum was Yvonne Gamble, and later Jorie Wright, who assumed operational control over KPG and its affiliated entities. This development proved disastrous for KPG, however, as neither Ms. Gamble nor Ms. Wright possessed Ms. Coleman's skills, tenacity, or vision. Consequently, as KPG's operations expanded, Ms. Gamble's and Ms. Wright's limited understanding of, and capacity for, the need to implement and maintain controls and oversight of KPG's capital procurement, real estate transaction, and mortgage brokering programs resulted in operational chaos during the very transitional period they were most essential.

Ms. Coleman had, for some time prior to taking her short leave of absence from KPG, planned on becoming a Mortgage Banker capable of issuing warehouse lines of credit (i.e becoming a Warehouse Lender). By the third quarter of 2006, KPG (through its affiliated entity, K Platinum Financial, Inc.) had nearly completed Phase I of this plan by establishing itself first as a local, then as regional mortgage broker. It had already begun to attract interest from national companies such as Long Beach Mortgage, WAMU, Own It Mortgage, World Leadership Group (and its affiliated entities, Global Realty Marketing, Global Equity Lending), and was prepared to embark on Phase II of the plan by leveraging its success and presence as a Broker into becoming a Mortgage Banker issuing privately held Warehouse Lines of credit.

KPG's initial concept was to leverage accrued capital in order to become a Mortgage Banker by obtaining a credit line of $5-10 million through financing from

companies such as First Collateral of Walnut Creek and National City of Cincinnati. KPG had anticipated that such an initial credit line, if successfully employed over time, would allow it to develop into a Mortgage Banker with a $50 million Warehouse Lending Facility.

However, Ms. Coleman's plans were sidetracked somewhat by the complications of her pregnancy and the distraction of her divorce. Accordingly, on December 20, 2006, Ms. Coleman and Ms. Wright executed a Memorandum Of Understanding purporting to sell Ms. Coleman's interest in KPG and its affiliated entities to Ms. Wright. However, the transfer was never formally consummated, and in January, 2007, after the resignation of Ms. Wright, Ms. Coleman re-assumed operational control when it became apparent that KPG was near insolvency and facing potentially ruinous civil liability, criminal investigations and administrative sanctions.

Then, on January 18, 2007, the FBI searched KPG's corporate offices, seizing substantial volumes of documents necessary for KPG to conduct its operations and to monitor pending real estate transactions. To date, however, there have been no federal or state criminal complaints or indictments against KPG or Ms. Coleman

The first of the consolidated actions commenced immediately thereafter, and on January 26, 2007, counsel for Ms. Coleman and KPG held a series of teleconferences, which discussed the potential for a corporate reorganization that could result in the repayment of creditors' note principal. Additionally, counsel for KPG and Ms. Coleman has met telephonically and in person with several creditors in an attempt to update and inform the creditors of KPG's reorganization plans.

Since February 1, 2007, KPG has endeavored to reorganize and restructure itself to meet its debt obligations. The reorganization thus far has involved an ongoing internal investigation and audit, as well as sizable contributions of over $700,000.00 capital investment of monetary funds from Ms. Coleman's personal assets to KPG in order pay creditors and promissory note holders. Indeed, the extent of Ms. Coleman's capitalization (involving liquidation of her personal assets and finances) presently leaves her on the brink of filing bankruptcy herself.

For instance, the recapitalize funds have been used to pay employee backwages; monthly operational expenses, such as utilities and lease obligations; insurance premiums; other creditors such as Federal Express and appraisal companies; the settlement of the *Docu v. K Platinum*; and the replacement of nonnegotiable checks issued by K Platinum to promissory note holders in December 2006. At present, unless reorganization is achieved, K Platinum will exhaust all its working monetary capital within 30 days.

Also, although KPG continues to maintain its operation in Walnut Creek, the company has tremendously downsized itself by laying off employees, consolidating lease obligations and merging its Sacramento and Walnut Creek offices. In an attempt to "cut the fat," Ms. Coleman has not taken any salaries, commissions, or earned income from KPG since December 2006. KPG's employee, brokers, and agents, have also sacrificed

their salaries and other earnings in order to streamline operational expenses of the Company. Some employees continue to work for little or no compensation.

Throughout the reorganization process, KPG has continued to successfully meet its federal and state tax obligations. Moreover, the Company has been able to satisfy all its licensing and regulatory fees and obligations. At present, there has been no suspension pr termination of KPG's or Ms. Coleman's licenses and accreditation with the State of California and/or the Department of Real Estate. The corporate and licensing status of KPG and Ms. Coleman, respectively, remains active on all fronts.

## III. THE CORPORATE REORGANIZATION OF KPG.

Since January 26, 2007, KPG has been diligently seeking to reorganize its operations and structure by seeking relationships with various entities in the real estate development and mortgage banking business. This restructuring serves to accomplish Ms. Coleman's long desired business objective of transforming KPG into a Mortgage Banker and Warehouse Lender.

As this report involves a discussion of the attempted corporate reorganization of K Platinum Group, Inc., and that discussion necessarily turns on concepts of real estate loans, mortgage banking, and Warehouse lending, counsel for K Platinum respectfully submits an outline of applicable mortgage banking developments and concepts, as well as the proposal for reorganizing K Platinum Group, Inc. into an entity capable of transacting business and responding to the Plaintiffs' claims.

To place this proposed reorganization in context, a summary of the mortgage banking industry is presented, followed by an outline of the participants, then followed by discussion of the reorganization plan, the motivations of the entities involved, and the benefit to KPG's creditors (including the Plaintiffs herein) resulting from such a reorganization.

### A. REGULATORY CHANGES HAVE GIVEN RISE TO A FINANCIAL SERVICES INDUSTRY INVOLVING MORTGAGE BROKERING, MORTGAGE BANKING AND WAREHOUSE LENDING IN THE SUBPRIME MARKET

Warehouse lending has become a significant part of the residential loan market. Historically, in the period prior to the 1980s, people typically obtained loans directly from mortgage bankers in the primary mortgage market. The mortgage lender then held and serviced the loan until it was satisfied by the sale or refinancing of the property. This historical pattern has, over the last quarter century, changed dramatically.

In the 1980s, regulatory changes in banking laws, including new rules and regulations, gave rise to changes through the domestic residential mortgage markets. These and other changes established innovative and different channels for residential mortgage financing. The mortgage markets thus became differentiated by two distinct channels of distribution and methods of funding and delivery: "Primary" markets, which

consist of loan originations to consumers and all related activities "prior" to the closing of the loan; and "Secondary" markets consisting of all loan activities subsequent to the closing of a loan (such as reselling the loan or assignment of servicing of the loan to another party).

One of the results of the regulatory changes that allowed for the creation of these Primary and Secondary markets was the "securitization" of loans – a process by which loans are bundled together or with other financial assets and then sold to investors (i.e. Mortgage Backed Securities). Over time, the securitization of loans has become so common that most loans eventually become securitized in one fashion or another.

In the 1990s, additional regulatory changes resulted in the loosening of loan underwriting standards regarding loan documentation and interest rates. Soon, properties were being purchased with near 100% financing on deposits as little as $1,000 for borrowers with what had previously been questionable credit histories. One of the consequences of these changes was a sharp increase in loan volume and, hence, the development of a new "subprime" loan market that, in turn, became increasingly securitized.

These changes ultimately lead to the creation of the current environment, where prospective homeowners obtain subprime financing with the assistance of third parties who could facilitate the loan process for a fee based on the percentage of the loan amount. These changes ultimately gave rise to parallel channels of loan commerce involving distinct operations by Mortgage Brokers, Mortgage Bankers, and Warehouse Lenders, all of whom play different roles in the securitization of loans.

The Mortgage Broker operates under a license granted by the department of real estate. Its primary responsibility is to solicit qualified prospective applicants and collect the required paperwork and documentation needed for regulatory compliance (i.e. Good Faith & Truth-in-Lending disclosures, Estimated HUD I Statements and properly completed borrower application form). The Mortgage Broker acts as the liason between the borrower and the Mortgage Banker. Together, these two are known in the industry as Mortgage Originators.

The Mortgage Banker actually funds the loan through the use of a line of credit (a requirement for operating as a Mortgage Banker versus a Mortgage Broker) issued by a commercial bank, known in the industry as a Warehouse Lender. The Mortgage Banker acts as a principal in the loan transaction, while the Mortgage Broker merely refers the loan for funding by the Mortgage Banker. In order to secure sufficient lines of credit to be competitive in the market, the Mortgage Banker may leverage its existing capital at a ratio of 20:1 by, for example, using assets of $250,000 to obtain credit lines of up to $5,000,000.

The Warehouse Lender is an institution – a commercial bank, for example – that extends lines of credit for a brief period in order to permit the Mortgage Banker to fund the loan. In order for the Mortgage Banker to obtain a funding for a particular loan from

the Warehouse Lender, it must first obtain a commitment from an investor to purchase the loan (called coverage in the parlance of the industry). To obtain coverage, the Mortgage Banker must first document the existence of and security for the loan.

The Mortgage Banker delivers the original file to the investor (with a copy to the Warehouse Lender which then extends the credit line to the Mortgage Banker). Once the investor – usually another Mortgage Banker or an investment house – acquires the loan, the Mortgage Broker, the Mortgage Banker and the Warehouse lender drop out of the picture.

The Mortgage Broker who refers the loan to the Mortgage Banker generates revenues from each loan transaction by negotiating a fee (usually a percentage of the loan amount, which is typically financed as part of the loan). The Mortgage Banker and the Warehouse Lender generate revenues by collecting on the difference between their "cost of funds" (the interest, if any, it is paying on the funds they advance to consummate the transaction) and the interest rate they collect on the transaction, plus a per file fee (anywhere from 200-500), plus any applicable late charges and re-conveyance fees.

**B. THE PARTICIPANTS**

The restructure currently involves the following entities who have executed Memoranda of Understanding (MOU) and/or Letters of Intent (LOI) concerning their anticipated relationship in/with the restructured entity: Milhaven Group, LLC; KPG, American Unified Mortgage, Inc., Pinnacle Investments, Inc./Cash Flow Specialists, and Global Realty Marketing.

**1. <u>K Platinum Group, Inc</u>.**

KPG claims total real estate commission revenues in 2006 of approximately $2,250,000.00, with an additional $250,000 in revenues generated from its activities as a Mortgage Broker.

Attached hereto as **Exhibit A** is a balance sheet for the year 2006 identifying KPG's assets and liabilities. An audited balance sheet is expected to be available within the next 30 days.

**2. <u>The Milhaven Group, LLC</u>.**

The Milhaven Group, LLC (hereafter TMG) is a solvent, high net worth, high liquidity Limited Liability Company that seeks to acquire existing platforms in order to achieve full spectrum vertical integration in the real estate development, sales and mortgage banking industries.

At present, TMG is in the business of residential real estate land development, production home building, and condominium development. TMG was formed in 2001 as a residential land developer, and in 2005 repositioned itself as a production home builder.

TMG's success has been achieved by skillful market positioning, a clear vision of developing markets, and comprehensive land use planning involving pre-approvals and entitlements obtained from the appropriate governmental entities.

Most recently, TMG has commenced construction of a Continuing Care Retirement Community (CCRC) in Blythe, California, which is set for completion in late 2008. Substantial funding for this project was obtained through a Private Placement Memorandum involving the issuance of Class B stock. In addition to that class of stock, TMG has reserved shares of Class A stock to be retained by its managers. The Blythe CCRC Project involves the construction of 56 sellable units, which are to be marketed at an average anticipated price of $437,500.00 per unit, and 100 rental units, which are to be marketed at an anticipated average price of approximately $3,000 per month per unit.

TMG, through funding capitalization pursuant to a Private Placement Memorandum, received $4,400,000.00 in 2006, generated primarily from sales of Class B stock.

Attached hereto as **Exhibit B** is an exemplar letter from TMG to its shareholders concerning the Blythe CCRC Project. An audited balance sheet reflecting TMG's assets and liabilities is expected to be available in the next 30 days. Attached hereto as **Exhibit C** is a March 16, 2007 Management Analysis of TMG's Financial Condition and Results of Operations describing its development approach. Attached hereto as **Exhibit D** is a copy of TMG's June 1, 2006, Private Placement Memorandum by which it raised capital for the Blythe, California CCRC project. Attached hereto as **Exhibit E** is a copy of a TMG advertising brochure regarding that project. Attached hereto as **Exhibit F** is a copy of a TMG newsletter to its current shareholders. Attached hereto **as Exhibits G - I**, respectively, are official documents and records from the City of Blythe concerning its January 9, 2007, approval for TMG's CCRC.

### 3. American Unified Mortgage.

American Unified Mortgage (AUM) is a nationwide, full service retail mortgage lender providing a comprehensive range of residential and commercial financing, both to current homeowners seeking to lower their monthly payments through refinancing, and consumers seeking their first home. Based in Oceanside, California, AUM was formed in 1992, and is now licensed in over 20 states and is federally approved under the Fannie Mae, Feddie Mac and FHA programs. AUM's management team brings over three decades of combined lending experience to the table. AUM has a present warehouse line of approximately $5,000,000.00 to 10,000,000.00.

### 4. Pinnacle Investments/Cash Flow Specialists.

Pinnacle Investments (PI) is a Phoenix, Arizona-based real estate investment company established in 1997. PI's target market is the real estate transaction professions. PI focuses on the purchase of first and second position real estate notes secured by Deeds of Trust, and has acquired over 12,000 such notes in the decade of its existence. PI has

developed flexible approaches to note funding and offers creative solutions to it client's funding needs. Pinnacle has the capacity for repurchasing (providing coverage for) between $10-25,000,000.00 worth of closed loan per month in the secondary market.

Cash Flow Specialists (CFS) was formed in 1999, and engages in a wide variety of financing transactions, from short term merchant cash advances to long term commercial building refinancing. CFS has brokered a transaction with PI to provide for up to $100M per month in Bulk Collateralized Mortgage Obligations (i.e. real estate notes secured by Deeds of Trust).

5. **Global Realty Marketing.**

Global Realty Marketing (GRM) is a nationwide real estate company that offers licensed agents and brokers that opportunity to build agent hierarchies though a proven marketing system. GRM offers structure and training to the agents under an Affiliated Referral Companies, and offers its contacts and resources to help maximize production by the its affiliated agents. GRM offers a platform of approximately 200 licensed real estate brokers in over 45 states and access to over 20 licensed and approved mortgage banks. Since September 2006, GRM and KPG have entered into a business collaboration involving utilizing GRM's national presence in listing properties and originating mortgage loans.

**B. THE REORGANIZATION PLAN**

KPG's reorganization plan addresses its insolvency problems from two perspectives: First, to be purchased by a solvent, liquid, and high net worth business entity looking to achieve vertical integration and willing to provide KPG's creditors with a return on their converted investments; Second, to expeditiously obtain a warehouse line facility in order to generate immediate cash flow and a profit center, thus enabling KPG to meet its present financial obligations and become profitable.

1. **TMG's Buy Out of KPG, Accompanied by KPG's Affiliation With GRM, Not Only Provides KPG's Cash-on Cash Claimants With TMG Stock That Can Be Liquidated On The Completion Of The Blythe CCRC, It Also Provide KPG's Affiliate, K Platinum Realty, Inc. A Means Of Generating Substantial Commission-Based Revenues To Meet Ongoing Operational Expenses and Creditor Claims.**

Under the proposed reorganization plan, TMG will acquire 100% of KPG's outstanding stock held by Ms. Coleman in order to achieve TMG's desired goal of full spectrum vertical integration in the real estate development, sales and mortgage banking industries. A true and correct copy of the fully executed Memorandum of Understanding ("MOU") between KPG and TMG is attached hereto as **Exhibit J**. As presented in the MOU, the parties will undergo a 90 day due diligence period and effectuate the preparation and signing of a Stock Purchase Agreement.

TMG's interest in KPG stems from the former's desire to buy a turn-key operation in the real estate and loan broker industry, thus allowing TMG to facilitate the listing, selling, and rental of its assisted living units in the plan development. KPG offers TMG an existing platform of licensed real estate and loan brokers throughout the nation with access to mortgage companies and banks. With the alignment between KPG and GRM, TMG seeks to capitalize on the resources, staff, and business relationships of these real estate companies. The reorganized KPG entity, in turn, will obtain an exclusive listing of the assisted living units through its affiliate K Platinum Realty and/or its affiliated referral company, GRM. Attached hereto as **Exhibits K-M** are communications from GRM confirming its continued interest in developing an Affiliated Referral business arrangement with KPG. Attached hereto as **Exhibit N** is a Power Point presentation prepared by GRM graphically showing the structure of that arrangement.

In sum, the arrangement described in the MOU will further TMG's goal of vertical integration, and with KPG's existing platform, TMG's and KPG's desire to again vertically integrate into mortgage bank will be realized.

This buy-out scenario involves a cash contribution of approximately $200,000.00 to KPG, which would be used to pay creditors and meet operating costs. Ms. Coleman will not take a personal share in this monetary consideration. With this cash infusion, KPG would be able to continue its reorganization efforts, continue to make payments to promissory note holders, and continue to retain attorneys and experts in the defense of the consolidated civil action and the proposed reorganization.

TMG will offer KPG's Cash-On-Cash creditors Class "A" Manager's Stock in satisfaction of their KPG Notes. Once the already-approved and under construction Blythe CCRC project is completed, TMG's Class "A" Manager's Stock can then be liquidated for a sum equal to or greater than the value of each outstanding KPG Note. TMG anticipates that construction of the Blythe CCRC project will be completed and the units certified for occupancy by the end of 2008.

While TMG's arrangement with KPG does not involve an outright, immediate or unconditional means of satisfying the principal or interest reflected in the outstanding KPG Notes, it does provide the Cash-On-Cash Claimants security for their money by means of an upscale real estate project, the completion of which will fund the satisfaction of those Notes. It also provides KPG's affiliated real estate brokerage, K Platinum Realty, Inc., of nearly $1,500,000.00 in commissions (assuming a commission rate of 6% per transaction, multiplied by 56 units sold at an average price of $437,500.00). This calculation does not even account for the commissions that could likely be generated through KPG's affiliation with GRM which, at 2006 levels of production for KPG, could generate upwards of $2,500,000.00 million in revenues.

2. **TMG's Anticipated Merger With AUM, Accompanied By TMG's Affiliation With Pinnacle Investments, Provides KPG With Both A Warehouse Line Of Credit and Coverage For Loans Funded By That Warehouse Credit Line, Thus Providing A Substantial Additional Revenue Stream For KPG To Meet Its Financial Obligations.**

As noted above, AUM is a Warehouse Lender with an available line of credit ranging from $5-10,000,000.00. Pinnacle currently has the capacity for re-purchasing up to $5-10,000,000.00 per month in closed loans, and through its relationship with CFS, has the potential for up to $100,000,000.00 per month in Bulk Collateralized Loans. Thus, once TMG absorbs AUM, it will have a $5-10M Warehouse Line of Credit that it can extend to Mortgage Originators to fund loans, while simultaneously guaranteeing, through Pinnacle and CFS, coverage for those loans of anywhere from $5-100M per month.

TMG is negotiating with AUM and Pinnacle on these fronts and anticipates formalizing its acquisition of AUM and its affiliation with Pinnacle once its acquisition of KPG is completed. Attached hereto as **Exhibit O** is a copy of a May 16, 2007, letter of intent from CFS regarding Pinnacle's anticipated affiliation with TMG. Attached hereto as **Exhibit P** is a copy of a letter of intent from Equity Pacific Mortgage regarding AUM's anticipated merger with TRM.

The revenues that the reorganized KPG can realize as a subsidiary of TMG, once it has consummated its plan of full spectrum vertical integration, is substantial. Assuming the very realistic goal of achieving 1 bps (basis point, aka 1 percent) of each dollar in repurchased loans, KPG could realize revenues of $250,000.00 on re-sales of $25,000,000.00 in loans. Given Pinnacle's present capacity of re-purchasing $25,000,000.00 per month in closed loans, this works out to a potential revenue stream of $3,000,000.00 per year. On $100,000,000.00 per month in potential for Bulk Collateralized Loan volume through CFS, KPG could conceivable generate additional revenues of $12,000,000.00 per year.

## IV. CONCLUSION

The bottom line for KPG, the Plaintiffs in this action, and any other of KPG's creditors or potential creditors (whether their claims be liquidated or un-liquidated) is that the proffered reorganization outlined above is the only alternative to KPG seeking bankruptcy protection that, in KPG's current financial state, would result in no recovery for anyone. That reorganization can only proceed forward if KPG's ability to lawfully generate further revenues is not effectively terminated by a Court Order freezing what few liquid assets currently available to it.

KPG's creditors – including the Plaintiffs herein – may well be disappointed by the prospect of having to first await the outcome of a corporate reorganization and then the fruition of TMG's Blythe CCRC Project. However, TMG's solvency, liquidity and

high net worth, coupled with its pending and anticipated business alliances, provide a safe harbor for Plaintiffs and other KPG creditors in the even the reorganization is successfully effected. In any event, the course of litigation in this matter would probably delay recovery by the Plaintiffs in this action until KPG's reorganization plans bore fruit anyway.

Respectfully Submitted.